UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CRIMINAL ACTION NO. H-06-00176 |
| | § | |
| ANDRES GOMEZ, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM AND ORDER

Pending before the Court are Defendant's Motion to Suppress Evidence (Doc. # 21) and First Amended Motion to Suppress Evidence (Doc. # 31). Defendant seeks to exclude statements that he made regarding his identity and status, on the grounds that he was detained and searched without reasonable suspicion, that he was arrested without probable cause, and that he was interrogated without being informed of, or waiving, his *Miranda* rights. For the reasons discussed at the July 27, 2006 hearing and set forth below, Defendant's motions are **DENIED**.

**I. Background**

The facts of this case are set forth in the government's response to Defendant's motions and will be summarized here. Although Defendant contends that his detention, search, arrest, and interrogation were all unlawful, he does not contest the government's account of the underlying events.

On April 24, 2006, Drug Enforcement Administration ("DEA") agents, with cooperation from local law enforcement, executed a federal arrest warrant for Edilberto Portillo, a known armed drug dealer. In executing the warrant, DEA agents first conducted surveillance of Portillo's business, in order to identify his whereabouts. Agents observed Isaid Salto Iturbide, who was known to be Portillo's body guard, conducting what appeared to be a discussion about a

pistol, which Iturbide was holding while standing next to Portillo's vehicle. Agents then observed Portillo emerge from his business and enter the driver's seat of his vehicle and observed Iturbide place the pistol into the back of his waistband and begin to enter the passenger side of Portillo's vehicle. Before Portillo drove away, Defendant approached Iturbide on the passenger side of the vehicle, tapped Iturbide on the back while saying something to him, and then entered the passenger side of the vehicle in Iturbide's place.

Approximately one-quarter mile from the location of the DEA surveillance, uniformed Houston Police Department ("HPD") officers stopped the vehicle driven by Portillo and occupied by Defendant. At the time, it was just before five o'clock on a Monday afternoon, and traffic conditions were extremely heavy. Based on information from the DEA agents that Portillo was armed and potentially accompanied by an armed bodyguard, HPD officers ordered Defendant out of the vehicle with their weapons drawn. The officers handcuffed Defendant for their safety and patted him down. During the pat-down search, officers found a loaded pistol in the waistband of Defendant's pants, as well as a loaded magazine of corresponding ammunition in Defendant's pocket. The officers subsequently arrested Defendant for committing the offense of unlawfully carrying a weapon, under Texas state law.

Defendant was then transported to DEA offices for questioning about his identity and involvement with Portillo. DEA Special Agent Trevino was called in to complete the DEA booking form (DEA-202) for Defendant, since it was determined that Defendant spoke only Spanish, and since Trevino was proficient in Spanish. The government asserts, and Defendant does not dispute, that Trevino was not involved in the investigation concerning Defendant, had not been present at the time of Defendant's arrest, and was not informed of any evidence or potential charges against Defendant. Trevino did not inform Defendant of his *Miranda* rights.

In response to questions 17, 18, and 19 on the DEA booking form, which asked for place of birth, citizenship, and alien status, Defendant stated to Trevino that he was in the United States illegally, and that he was a citizen of Mexico.

Sometime following Defendant's statements to Trevino, Special Agent Chris McMillan of the Bureau of Immigration and Customs Enforcement ("ICE") determined that a query of all of the identifiers that Defendant had provided produced no records of any legal entry into the United States.   On May 16, 2006, ICE Special Agents Mark Stuart and Marco Salderelli conducted an administrative immigration interview of Defendant at the Federal Detention Center, pursuant to pending deportation proceedings that had been initiated against Defendant. During the interview, Defendant admitted to being a citizen and national of Mexico and to entering the United States illegally.  ICE agents subsequently found that Defendant was illegally within the United States.

## II. Search and Seizure

### A. Detention and Pat-Down Search

Defendant asserts that the HPD officers unlawfully detained and searched him without reasonable suspicion, and therefore, that the subsequently derived evidence is inadmissible.  In order to demonstrate that the detention was based on a reasonable suspicion of criminal activity, the government must point to specific and articulable facts, together with rational inferences drawn from those facts, that reasonably suggest that criminal activity had occurred or was imminent.   *Terry v. Ohio*, 392 U.S. 1, 21 (1968).   A police officer who undertakes an investigatory detention may conduct a limited pat-down frisk of the detainee's outer clothing if the officer has a reasonable belief that the detainee poses a threat to the officer's safety or the safety of others.  *Id.* at 27; *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992).

Here, Defendant does not contest that the HPD officers lawfully conducted the initial traffic stop of Portillo's vehicle based on the authority of the federal warrant for Portillo's arrest. Once they had stopped the vehicle, then, the officers had the authority to order Defendant, who was seated in the vehicle's passenger seat, to exit the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997); *United States v. Tellez*, 11 F.3d 530, 533 (5th Cir. 1993). At this time, the officers were acting on information from the DEA agents that Portillo was a notorious drug dealer who commonly traveled with armed bodyguards. Although the DEA agents conducting surveillance at Portillo's business did not see Defendant with a firearm, they witnessed Defendant trade places with Iturbide, who they knew to be Portillo's bodyguard and who they had witnessed with a pistol immediately prior to his trading places with Defendant. It would have been reasonable, therefore, for the officers to believe that Defendant was also carrying a firearm and acting as Portillo's bodyguard. Further, the stop of Portillo's vehicle took place on a busy street during heavy traffic conditions, thereby increasing the potential danger of such a firearm to the officers and to civilians.

These specific and articulable circumstances are sufficient to give rise to a reasonable suspicion that Defendant was armed and posed a threat to the lives of both the officers and civilian passersby. The officers were therefore justified in patting Defendant down for weapons, and in first placing Defendant in handcuffs to prevent him from reaching such a weapon before or during the pat-down search. *See United States v. Jordan*, 232 F.3d 447, 449 (5th Cir. 2000) (holding that "after making a proper *Terry* stop, the police are within their constitutional authority to pat down a party and to handcuff him for their personal safety even if probable cause to arrest is lacking"); *see also United States v. Del Toro*, 464 F.2d 520, 521-22 (2nd Cir. 1972) (finding the detention and pat-down search of a known narcotics dealer's sole companion to be

justified, despite the fact that the companion was not uncooperative and that the police were present in force).  Accordingly, neither the firearm and ammunition recovered from the pat-down search of Defendant, nor any subsequent statements made by Defendant, will be suppressed on this basis.

### B. Arrest

Defendant similarly contends that his arrest, which followed the officers' discovery of the pistol in his waistband, was without probable cause to believe that he was engaged in criminal activity.  This contention also fails.  As the government points out, a person commits an offense under Texas state law if he intentionally, knowingly, or recklessly carries on or about his person a handgun.  TEX. PENAL CODE § 46.02(a).  Thus, when officers found the pistol in Defendant's waistband, they had probable cause to believe that Defendant had committed the offense of unlawfully carrying a weapon.

At the July 27, 2006 hearing, Defendant argued that probable cause for his arrest was lacking because the officers could not have ascertained, at the time of his arrest, whether he fell within the "traveling" exception to the offense of unlawfully carrying a weapon.  *See* TEX. PENAL CODE § 46.15(b) (making the offense of unlawfully carrying weapons inapplicable to a person who is traveling).  A person is presumed to be traveling if that person is:  (1) in a private motor vehicle; (2) not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic; (3) not otherwise prohibited by law from possessing a firearm; (4) not a member of a criminal street gang; and (5) not carrying a handgun in plain view.  TEX. PENAL CODE § 46.15(i).  Defendant does not contest that, because he is an illegal alien, he is otherwise prohibited by law from possessing a firearm, and thus, not subject to the traveling exception.  Rather, Defendant argues that, at the time of his arrest, the

officers had no way of knowing that he was an illegal alien and not covered under the traveling exception.  Defendant contends that, because the officers could not have discerned whether or not he was in violation of the Texas state law prohibiting the unlawful carrying of weapons, there was no probable cause for his arrest.

While traveling is one of several defenses to a charge of unlawfully carrying a weapon, however, the possible application of the defense does not affect probable cause to arrest. Probable cause exists when law enforcement officers have, at the moment the arrest is made, knowledge of reasonably trustworthy facts and circumstances to warrant a belief by a prudent person that an offense has been or is being committed.  *Beck v. Ohio*, 379 U.S. 89, 91 (1964). That certain defenses or exceptions might ultimately apply to shield the arrestee from criminal liability does not negate an officer's reasonable belief that an offense is being committed.  Thus, when officers found Defendant with a handgun in his waistband, they reasonably believed that he was committing the offense of unlawfully carrying a weapon, and probable cause existed for his arrest.  Defendant's assertion that his later statements must be excluded as the fruits of an illegal arrest therefore fails.

## III. Interrogation

Finally, Defendant contends that the statements that he made to the government agents must be suppressed because Defendant was not informed of, and did not waive, his *Miranda* rights.  Because Defendant does not specify which statements he seeks to suppress, the Court will assume that Defendant's motion encompasses both the statements that he made to DEA Agent Trevino on April 24, 2006, as well as the statements that he made to ICE Agents Stuart and Salderelli on May 16, 2006.  As the government concedes, prior to conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect that:  (1) he has the

right to remain silent; (2) his statements may be used against him at trial; (3) he has the right to the presence of an attorney during questioning; and (4) if he cannot afford an attorney, one will be appointed for him. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). The government does not contest that Defendant was in custody at the time that he made all statements relevant to his motions to suppress, and that he was not informed of his *Miranda* rights prior to making any of these statements.

With respect to Defendant's statements to DEA Agent Trevino, however, the government asserts that no *Miranda* warnings were required because the statements were not made in the course of interrogation. Rather, the government contends, Trevino's inquiries consisted merely of routine, biographical booking questions. Such routine booking questions, which are reasonably related to police record-keeping and administrative needs, do not implicate *Miranda* protections as long as they are not "designed to elicit incriminating admissions." *Pennsylvania v. Muniz*, 496 U.S. 582, 602 n.14 (1990); *see also Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980). Here, the government points out that Trevino was brought in solely to book Defendant by completing the booking form DEA-202. In doing so, Trevino asked Defendant for his place of birth, place of citizenship, and alien status, in addition to other biographical information, as required by form DEA-202. Trevino was not involved in the investigation concerning Defendant, had not been present at the time of Defendant's arrest, and was not informed of any evidence or potential charges against Defendant. Moreover, Defendant's arrest was based upon his possession of a firearm and was unrelated to his immigration status.

While Defendant argued at the July 27, 2006 hearing that he should have been informed of his *Miranda* rights because his citizenship turned out to be such an important issue in this case, this does not contradict or negate the government's showing that Trevino asked Defendant

7

only routine, biographical booking questions.  Nor does it contradict the government's showing that Trevino's questions were not designed or intended to elicit any incriminating response from Defendant.  As the government notes, other courts have applied the "routine booking question" exception to *Miranda* where, like here, the information sought from the defendant is primarily biographical and not intended to elicit an incriminating response.  *See, e.g., United States v. Reyes*, 225 F.3d 71, 76-77 (1st Cir. 2000) (finding the routine booking exception to apply where an agent asked only those questions indicated on a standard DEA booking form, which made no reference to the offense for which the defendant had been arrested, and where the booking interview was conducted separately from any substantive interrogation); *see also United States v. Rodriguez*, 356 F.3d 254, 259 (2nd Cir. 2004) (finding that *Miranda* warnings were not improperly withheld, because the questioning agent was unaware of the potentially incriminatory nature of the information requested); *United States v. Salgado*, 292 F.3d 1169, 1172-73 (9th Cir. 2002) (finding an officer's inquiry into the defendant's birthplace, nationality, and citizenship not to be interrogation because the defendant's arrest was unrelated to his immigration status).  Here also, Defendant's statements to Trevino were made in response to routine booking questions regarding his birthplace, citizenship, and alien status, and they will not be suppressed.

Turning to Defendant's subsequent statements to ICE Agents Stuart and Salderelli, the government contends that these statements should be admitted under the independent source doctrine, and because Stuart and Salderelli conducted only an administrative deportation interview with Defendant, for which *Miranda* warnings are not required.  The independent source doctrine holds that, if evidence is derived from a source independent of illegally obtained evidence, it can properly be admitted into evidence.  *United States v. Bookins*, 614 F.2d 1037, 1041-42 (5th Cir. 1980).  As discussed above, however, the Court finds that Defendant's

statements to Trevino were not illegally obtained, and accordingly, there appears to be no need to apply the independent source doctrine. Moreover, Defendant has pointed to no unlawfulness in Stuart and Salderelli's interview to justify excluding his statements. Defendant does not challenge the government's contention that his contact with Stuart and Salderelli consisted solely of a deportation interview for administrative purposes. *Miranda* warnings are not required in this context, as deportation proceedings are civil, and not criminal, in nature. *Bustos-Torres v. INS*, 898 F.2d 1053, 1056 (5th Cir. 1990). Accordingly, Defendant's statements to Stuart and Salderelli were obtained lawfully and will not be suppressed because of the agents' failure to admonish Defendant of his *Miranda* rights.

Finally, the government contends that Defendant's statements regarding his alienage are admissible under the inevitable discovery exception. This exception applies when evidence obtained unlawfully would have been inevitably discovered through independent, lawful means. *See Murray v. United States*, 487 U.S. 533, 539 (1988); *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001). It is not necessary to apply this exception here, as Defendant's statements to both Agent Trevino and to Agents Stuart and Salderelli were lawfully obtained. Had the statements been obtained in violation of Defendant's *Miranda* or other rights, however, the Court agrees that the inevitable discovery exception would prevent the exclusion of Defendant's statements regarding his alienage. As the government points out, had the Defendant not been taken to the DEA offices for booking or admitted to Agent Trevino that he was an illegal alien, Defendant would have been booked by the Houston Police Department and the Harris County Sheriff's Department for the state offense of unlawfully carrying a weapon. Both the HPD's booking sheet and the Harris County Sheriff's inmate processing sheet, which the government attached to its response, would have required Defendant to provide his place of birth, and the

Sheriff's inmate processing sheet would have also required Defendant to state whether or not he was a citizen.  In this scenario, law enforcement officers would have discovered Defendant's status as an illegal alien lawfully and independently of any questioning by the DEA and ICE agents.  For this reason, as well, Defendant's statements regarding his alienage are admissible.

## IV. Conclusion

As set forth above, the Court finds that the HPD officers properly detained and searched Defendant, and that probable cause existed for Defendant's arrest.  Similarly, the Court finds that Defendant's statements regarding his status as an illegal alien were properly obtained and should not be excluded.  Defendant's motions to suppress are therefore **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this 4th day of August, 2006.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL
FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY
EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT